IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOSHUA LEE HOSKINS,          )
                                     )
      Plaintiff,           )
                                     )
      v.                     )        Case No.   17-cv-1122-RJD
                                     )
FRANK EOVALDI, et al.,        )
                                     )
      Defendants.      )

**ORDER**

**DALY, Magistrate Judge:**

Plaintiff Joshua Lee Hoskins, an inmate in the custody of the Illinois Department of Corrections ("IDOC") brings this lawsuit pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while he was incarcerated at Menard Correctional Center ("Menard"). Plaintiff alleges he was confined in the segregation unit at Menard from November 30, 2016 through January 4, 2017 and, during that time, was held in a cell under inhumane conditions. Plaintiff alleges security staff also denied him basic hygiene products and refused to process or allow Plaintiff to file grievances. Plaintiff's complaint was screened pursuant to 28 U.S.C. § 1915A, and he was allowed to proceed on the following claims:

> Count One: Eighth Amendment excessive force claim against Eovaldi for twisting and bending Plaintiff's hand and fingers on November 30, 2016.
>
> Count Two: Eighth Amendment deliberate indifference claim against all Defendants for placing and/or holding Plaintiff in an unsanitary cell contaminated with human waste, and/or refusing to relocate him or remedy the unhealthy conditions between November 30, 2016 and January 4, 2017.
>
> Count Three: First Amendment claim against Eovaldi, Sanders, Young, Lt. Engelage, Officer Engelage, Hudson, Jetton, Carter, Witthoft,

Officer Spiller, Swisher, Hof, Laminack, Bump, Mercer, Snell, Mennerich, Marshall, Reva Engelage, Hartman, Roth, Lang, Gardiner, Myers, Brookman, Held, Slavens, McCarthy, Wooley, Sanders, William Spiller, Gee, Phelps, Gutreuter, and Allen for placing and/or holding Plaintiff in an unsanitary cell to retaliate against Plaintiff for his litigation and/or grievance activity against Menard officers.

Count Four:  Eighth Amendment deliberate indifference claim against health care providers Marshall, Reva Engelage, and Lang for refusing to provide Plaintiff with medical attention for the skin irritation, nausea, and other conditions he developed while housed in the unsanitary and contaminated cell.

This matter is now before the Court on Defendants' Motion for Summary Judgment (Doc. 152).  For the reasons set forth below, the Motion is **DENIED**.

## **Factual Background**

The incidents giving rise to the claims in this lawsuit occurred at Menard from November 30, 2016 to January 4, 2017.   Upon Plaintiff's arrival to Menard from Stateville on November 30, 2016, he was taken to the chapel and strip searched (Deposition of Joshua Lee Hoskins, Doc. 153-1 at 374-75; Complaint, Doc. 1 at 28[1]).   Defendant Frank Eovaldi, the shift commander at Menard when Plaintiff arrived, saw Plaintiff while he was in the chapel and, while Plaintiff's hands were behind his back, Eovaldi twisted and bent Plaintiff's fingers and hands (Doc. 153-1 at 410; Doc. 1 at 28).   Eovaldi told Plaintiff that he "had a cell that was in a fucked up condition" and told Plaintiff that Eovaldi, along with Defendants Sergeant Hudson, Major Carter, and Officer Spiller, had told the North Two staff not to better his living conditions (Doc. 153-1 at 411; Doc. 1 at 28).   Eovaldi also told Plaintiff he was retaliating against him because Plaintiff had brought a lawsuit against him and sought preliminary injunctive relief that was granted in September 2016

---

[1] In his response to Defendants' motion for summary judgment, Plaintiff included an affidavit attesting to the accuracy of the allegations in the complaint (Doc. 155 at 11).   Indeed, Plaintiff asserts he has reviewed the complaint and finds no errors in the same.   Accordingly, the Court cites to the complaint as evidence in the record.

(Doc. 153-1 at 414).

Plaintiff was placed in cell 4-43 in the North 2 cell house segregation gallery (Doc. 1 at 28; *see* Doc. 153-1 at 507).   Plaintiff testified that this cell had a clogged toilet and sink, and no light switch (Doc. 153-1 at 378; Doc. 1 at 28).   According to Plaintiff, there was blood on the sink and the bed, and feces on the floor (Doc. 153-1 at 378).   Also, when toilets were flushed in cells that were above Plaintiff's, urine and feces would come down the walls (*Id.*).   Plaintiff's cell was also infested with various insects that caused him to itch and develop pus-filled blisters, which resulted in sores and skin infections (Doc. 1 at 28).

Defendants dispute Plaintiff's contentions regarding the cleanliness of cell 4-43.   In support of their contention, Defendants point to a Shakedown Record completed on November 30, 2016 in which it was noted the cell was "clean" at 8:15 a.m.[2] (*see* Doc. 153-1 at 499).

On November 30, 2016, while Plaintiff was standing by the IDOC transportation bus, Lt. Mennerich saw Plaintiff's IDOC photograph and remarked that they had been "waiting" for Plaintiff (Doc. 1 at 34).   Mennerich said that Eovaldi and Spiller told everyone Plaintiff would be coming and told Plaintiff he would be placed in a contaminated cell (*Id.*).

On December 1 and December 2, 2016, Defendant Sergeant Lindenberg came to Plaintiff's cell, and Plaintiff made Lindenberg aware of the conditions in his cell (Doc. 1 at 29).   Lindenberg indicated Plaintiff should know he would be mistreated by staff due to Plaintiff having a staff

---

[2] Defendants failed to provide an affidavit attesting to the accuracy of the records submitted.   Accordingly, although the Court references these records in this Order, it does not ultimately rely on the records because they have not been properly introduced with a sufficient "indicia of trustworthiness to be considered reliable."  *See Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000) (To be admissible as a business record, a document must have sufficient indicia of trustworthiness to be considered reliable. Normally, to demonstrate such trustworthiness and reliability at the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence as trial, for example, a custodian or anyone qualified to speak from personal knowledge that the documents were admissible business records.") (internal citations omitted).

assault in his disciplinary history (*Id.*).   Lindenberg indicated he knew of Plaintiff's cell conditions and he was not going to take any action to address the same (*Id.*).   At his deposition, Plaintiff testified that Lindenberg toured his gallery on many occasions, and Plaintiff would explain his cell conditions and request showers, cleaning supplies, and hygiene items, but his requests were denied (Doc. 153-1 at 442).   Defendant Officer Sanders was assigned to Plaintiff's gallery on December 1 and 2, 2016, and told Plaintiff he was not going to have Plaintiff's cell cleaned or his toilet or sink unclogged because Sanders had been informed that Plaintiff had filed "court complaints" against Menard staff (Doc. 1 at 29).   Sanders told Plaintiff he had to be seen by Ms. Franklin, a mental health professional, but that Sanders would be present to ensure Plaintiff did not tell Ms. Franklin about his cell conditions or about his mistreatment by staff at Menard (*Id.*).   Both Sanders and Defendant Sgt. Young were present while Plaintiff saw Ms. Franklin (*Id.*).   Plaintiff told Sgt. Young he needed to speak with him, to which Young replied, "Hoskins we don't have shit to talk about. How you like the cell we have you in?" (*Id.*).   Young also made comments indicating Plaintiff would not be receiving any cleaning supplies and the conditions of his cell would not be addressed (*Id.*; Doc. 153-1).   Sometime from December 1 to December 3, 2016, Defendant Lt. Engelage walked past Plaintiff's cell and told Plaintiff that if he did not file complaints against staff he would not have been placed in "that nasty ass" cell (Doc. 1 at 29).   On December 3, 2016 and December 6, 2016, Defendant Officer Engelage looked up at Plaintiff's cell and told Plaintiff he was getting what he deserved, indicating that Plaintiff was being held in that "contagious ass cell" because he snitched on staff (*Id.* at 30).

Sometime between November 30 and December 3, 2016, Defendants Hof and Sgt. Laminack walked past Plaintiff's cell and he called out to tell them about the unsanitary cell conditions (Doc. 1 at 31-32).   Hof told Plaintiff they know about the conditions and that he was

placed in that cell because he had brought court complaints against Menard staff (*Id.* at 32; Doc. 153-1 at 433).

Subsequently, on December 5, 2016, Defendant Sergeant Hudson walked past Plaintiff's cell during the morning shift and observed the conditions in the cell and told Plaintiff that each time he complained against staff the conditions would worsen (Doc. 1 at 30).   Hudson was also made aware that Plaintiff did not have a light switch, and when inmates above Plaintiff flushed their toilets feces and urine would leak to Plaintiff's cell (Doc. 153-1 at 434).   Hudson told Plaintiff they were housing him in that cell because Plaintiff had filed court complaints (Doc. 1 at 30).   Also on this date during the morning shift, while Defendant Officer Spiller was going in and out of the door directly in front of Plaintiff's cell, he observed Plaintiff and told Plaintiff that is "how we treat dogs like you" (Doc. 1 at 30).   The next day, Spiller told Plaintiff that if he complained to any staff about his cell conditions it would be a waste of time because "they already know" (*Id.* at 31).   On December 8, 2016, Spiller told Plaintiff not to waste his time filing grievances because he was on mail watch and any grievances about his cell conditions would be destroyed (*Id.*).   Spiller told Plaintiff he would stay in his cell with the toilet, sink, and ceiling issues (*Id.*).

On December 5, 2016, Lt. Bump walked through Plaintiff's gallery and, when he walked past Plaintiff's cell, asked Plaintiff how he liked his cell with the "toilet full of shit and piss" (*Id.* at 32).   Bump told Plaintiff the Menard staff was advised to not put in any work orders (*Id.*).   Bump also indicated that they don't "give a fuck" about any lawsuits and they will not be affected by any further lawsuits (*Id.*).   Around this time Sgt. Laminack also walked past Plaintiff's cell again and told Plaintiff not to call out for him because Plaintiff would be staying in that "filthy ass" cell (*Id.*). On two occasions between November 30 and December 5, 2016, while Sgt. Mercer walked past

Plaintiff's cell, Plaintiff told Mercer about the unsanitary conditions in his cell, and Mercer told Plaintiff he knew about the conditions and that Eovaldi, Spiller, and others told Mercer they were ensuring Plaintiff was housed in that cell (*Id.*).   Mercer told Plaintiff he could submit work orders, which he was supposed to handle, but he was told by two officers that Plaintiff appeared in front of a federal judge in late September 2016 and told the judge that he was being mistreated by Menard staff, and for that reason, Mercer was going to leave Plaintiff housed in the unsanitary cell (*Id.* at 33).

At some point between November 30, 2016 and December 5, 2016, medical technician Marshall told Plaintiff she had to dispense his psychotropic medication, but she would not provide any care for his other complaints (*Id.* at 37).   At his deposition, Plaintiff testified Marshall told him he would not receive medical treatment because he had filed lawsuits and grievances (Doc. 153-1 at 443).   Marshall told Plaintiff any sick call requests were being thrown away and staff was told not to forward any request slips (Doc. 1 at 37).

On December 5, 2016, Officer Myers, a shower officer, walked past Plaintiff's cell and told Plaintiff he had heard that Plaintiff was complaining about his cell conditions to staff at Menard (*Id.* at 38).   Myers told Plaintiff he was not going to be allowed to shower or go to yard, or receive any cleaning products (*Id.*).   Myers mentioned that he had seen Plaintiff had a staff assault in his disciplinary history and this was his way of helping that officer "get back at" Plaintiff (*Id.*). Plaintiff also testified that Myers told him he would not be providing Plaintiff any hygiene items or cleaning supplies because he had filed lawsuits against Spiller and told the "federal court" about his mistreatment at Menard (Doc. 153-1 at 450).

On December 6, 2016, Defendant Officer Swisher saw Plaintiff and told him they had his cell waiting for him and that Plaintiff "got what was coming to him" (Doc. 1 at 31).   On December

Page **6** of **27**

9, 2016, while Plaintiff was in the holding cage area to be seen by mental health staff, Swisher told Plaintiff he would not be seen because he did not want Plaintiff telling the mental health staff that he was placed in a cell with blood everywhere (*Id.*).   Swisher told Plaintiff he would tell mental health that Plaintiff refused to be seen and that Officer Hoffman would sign Plaintiff's refusal form (*Id.*).   Swisher told Plaintiff that Swisher and Eovaldi placed Plaintiff in cell 4-43 purposely and partly because Plaintiff sent a grievance to the ARB in early 2016 naming Swisher and Spiller (*Id.*).   At his deposition, Plaintiff testified that Swisher told Plaintiff he would not provide Plaintiff with showers, hygiene items, sheets, blankets, better living conditions, or medical treatment due to Plaintiff complaining about Menard staff to the federal judge (Doc. 153-1 at 463).

On December 6, 2016, Plaintiff called out to Sgt. Snell during the morning shift and identified the unsanitary conditions of his toilet, sink, ceiling, floor, and mattress (Doc. 1 at 33). Snell responded that there was no way he was going to assist Plaintiff and told Plaintiff he was aware of issues Plaintiff brought to the court about Sgt. Hudson, Spiller, and Engelage, and knew about the officer assault in Plaintiff's history (*Id.*).   Plaintiff also testified that Snell indicated he knew about Plaintiff's court complaints (Doc. 153-1 at 459).   During the evening shift on December 5 and December 6, 2016, Plaintiff made Officer Morris aware of his unsanitary cell conditions, to which Morris indicated that Wooley, Spiller, Gee, Eovaldi, Hudson, and Carter had asked all staff to keep Plaintiff in cell 4-43 (Doc. 1 at 33).   Morris also told Plaintiff that he was aware of a staff assault in Plaintiff's history, and would not do anything to better his cell conditions for that reason as well (*Id.*).   On December 6, 2016, Ms. Myers, a mental health professional, toured Plaintiff's gallery and Plaintiff told her about the unsanitary conditions in his cell (*Id.* at 35). Plaintiff asked Myers to make note of his complaints and forward the complaints to the Menard Warden (*Id.*).   Myers told Plaintiff she was not going to make note of his complaints because it

was not a "mental health function" (*Id.*).

On December 7, 2016, Mennerich came on Plaintiff's gallery and stood in front of cell 4-44 (Doc. 1 at 34).   Plaintiff described the unsanitary conditions of his cell (*Id.*).   Mennerich told Plaintiff he could and should have Plaintiff placed in a better cell, but he would not because he knew all about Plaintiff (*Id.*).   On December 9, 2016, Plaintiff again saw Mennerich, who advised Plaintiff that Mennerich had spoken with maintenance and engineering to falsify documents to demonstrate there was nothing wrong with Plaintiff's cell prior to his placement (*Id.*).   Mennerich again told Plaintiff he told staff to leave him in that cell and not provide Plaintiff with any cleaning supplies or hygiene necessities (*Id.*).   Mennerich explained that Ms. Myers, a mental health professional, told Mennerich that Plaintiff complained about his cell conditions to her on December 6, 2016, but she did not document those complaints in her notes (*Id.*).

On December 8, 2016, Officer Engelage told Plaintiff that Engelage and other staff members would ensure Plaintiff stayed in cell 4-43 because Plaintiff had submitted complaints against Engelage's "loved ones" and because Plaintiff had a staff assault in his history (Doc. 1 at 30).

On December 10, 2016, shortly after 2:30 a.m., Sgt. Mercer was on Plaintiff's gallery with a nurse and observed Plaintiff awake in his cell (Doc. 1 at 35).   Mercer told Plaintiff he would be staying in that cell and the conditions in the cell would not change (*Id.*).   Later that morning, Sgt. Hudson stopped near Plaintiff's cell and told Plaintiff he would not be moving from that cell and no work orders would be put in to address the issues in the cell (*Id.*).   At some point Ms. R. Engelage, the medical technician, and Officer Engelage toured the gallery and R. Engelage told Plaintiff he knew "they" did not "give a fuck about his cell conditions" or his health issues (*Id.*). R. Engelage told Plaintiff that she, Lang, and Marshall "posted" for all healthcare unit medical

staff to not provide Plaintiff with medical treatment and to destroy any and all sick call slips submitted to the healthcare unit (*Id.*).   Plaintiff testified at his deposition that R. Engelage saw his health conditions, including his pus-filled blisters and skin redness, and she told him all sick call slips would be destroyed (Doc. 153-1 at 418).   Later, during the 3 to 11 shift, Lt. Bump did a walk through in Plaintiff's gallery and saw Plaintiff sitting on his bed (Doc. 1 at 36).   Bump told Plaintiff the staff was told not to move Plaintiff from that cell, and not to fix the toilet, sink, or ceiling (*Id.*).   Bump told Plaintiff he did not care what Plaintiff told "that judge in East St. Louis, Illinois" about Menard staff in early September 2016 (*Id.*).

On an unknown date, presumably in early December 2016, Defendants Lt. Witthoft, Jetton, Sgt. Young, and Major Carter toured Plaintiff's gallery and stopped at his cell (Doc. 1 at 30). Carter stated that "they" had been waiting for Plaintiff to return to Menard on a court writ, and Witthoft added that they knew Plaintiff went to federal court in late September 2016 and told a federal judge how Plaintiff was mistreated by Menard staff (*Id.*).   Whitthoft told Plaintiff that because of that action he would make sure Plaintiff was not moved out of cell 4-43 (Doc. 1 at 30). Witthoft also told Plaintiff neither he nor other staff would provide Plaintiff with cleaning materials, bedding, sheets, blankets, or clothing (Doc. 153-1 at 464).   Carter stated that he would make sure no work orders were put in to have Plaintiff's sink or toilet fixed and unclogged (Doc. 1 at 30).   Jetton stated she would tell the cellhouse workers not to provide Plaintiff with any cleaning supplies and she would make Plaintiff suffer while he was in his unsanitary cell because Plaintiff told a federal judge about Menard staff "months ago" (*Id.*).   Young added that Eovaldi and Spiller would be glad to see that Plaintiff was housed as they had requested (*Id.*).   At his deposition, Plaintiff did not attribute any work order comments to Defendant Carter, rather, he testified Carter saw the conditions in Plaintiff's cell and told Plaintiff that his requests for a

shower, hygiene necessities, and better living conditions would be denied due to Plaintiff bringing forth federal complaints (Doc. 153-1 at 406).

On December 11, 2016, Officer Hartman walked past Plaintiff's cell door, and Plaintiff yelled to him about the unsanitary conditions of his cell (Doc. 1 at 36).   Hartman told Plaintiff they knew about the conditions of his cell and placed him in that cell purposefully because Plaintiff told "federal judges about" Menard staff (*Id.*).   Officer Roth looked up at Plaintiff's cell from the lower gallery and Plaintiff identified himself and explained the conditions in his cell (*Id.*).   Roth responded that staff placed Plaintiff in that cell because Plaintiff filed complaints to the courts against Menard staff (*Id.*).   At some point, medical technician Lang walked down Plaintiff's gallery and, before Plaintiff could set forth his health issues, Lang told Plaintiff he should not bother sending medical request slips (*Id.*).   Plaintiff testified Lang was aware of his cell conditions and saw Plaintiff's health issues, but refused to provide medical treatment on Plaintiff's request (Doc. 153-1 at 440).   Plaintiff also testified she told healthcare staff not to provide Plaintiff any medical treatment, and explained to Plaintiff it was because he filed grievances and a lawsuit against her (*Id.*).   As Lang was talking to Plaintiff, Officer Gardiner observed Plaintiff and told him not to send another kite to internal affairs about his cell conditions or his health issues (Doc. 1 at 37).   Gardiner told Plaintiff they were not going to help him and indicated Plaintiff was placed in that cell because he submitted complaints against staff and against intelligence staff (*Id.*). Gardiner also indicated he knew what Plaintiff told the judge about Sgt. Hudson, Sgt. Spiller, and medical technician Engelage (*Id.*).

During the morning shift on December 12, 2016, Sergeant Hudson observed Plaintiff standing in his cell and told Plaintiff he would not be going to yard, and that he would not ever go to yard (Doc. 1 at 38).   Hudson also told Plaintiff that his sink, toilet, ceiling, mattress, and floor

would stay in the condition they were in and all staff members had been told not to move Plaintiff from that cell (*Id.*).   During the 3 to 11 shift, Officer Myers stopped at Plaintiff's cell and told Plaintiff he would not be moved from that cell and his toilet, ceiling, and sink would not be fixed (*Id.*).

On December 13, 2016, while Plaintiff was being escorted through the visiting room, he walked past Lt. Brookman, who immediately told Plaintiff he needed to quit sending kites to the lieutenants because they "don't give a fuck" (Doc. 1 at 39).   Brookman explained he was disappointed to hear Plaintiff went to an East St. Louis courthouse and told a federal judge how Menard staff had mistreated him (*Id.*).   Brookman told Plaintiff he would be kept in cell 4-43 until he was transferred out of Menard (*Id.*).   Plaintiff also testified that Brookman admitted telling Menard staff not to let him shower or receive hygiene items or medical treatment because he told a federal judge about the staff at Menard (Doc. 153-1 at 398-99).   Later, Officer Gardiner came to Plaintiff's cell and told Plaintiff he was on "mail watch" and his outgoing mail would be opened and any complaints about his cell conditions would be destroyed (Doc. 1 at 39).   Gardiner explained he had the authority to house Plaintiff in a better cell, but would not move him because Plaintiff filed court complaints against Menard staff (*Id.*).   Plaintiff also saw Lt. Held and yelled to him (*Id.*).   Held told Plaintiff not to call his name because Held was not Plaintiff's friend (*Id.*). Held told Plaintiff he knew about the issues in Plaintiff's cell and that just like Brookman said, they were not going to do anything about Plaintiff's cell (Doc. 1 at 40).   Plaintiff testified that Held told him he was not allowing him to shower or receive hygiene necessities because Plaintiff had filed lawsuits and grievances against Menard staff (Doc. 153-1 at 431-32).

During the 3 to 11 shift on December 14, 2016, Lt. J. Engelage observed Plaintiff standing at his cell bars and, before Plaintiff could address the unsanitary conditions, Engelage told Plaintiff

that they were not going to move him to another cell so Plaintiff can stop sending kites to all majors, lieutenants, counselors, and internal affairs staff (Doc. 1 at 40).   Engelage reiterated that Plaintiff would not be receiving any medical treatment and any sick call slips would be destroyed (*Id.* at 41).   Engelage said he was doing this because Plaintiff submitted complaints about Menard staff and had a staff assault in his disciplinary history (*Id.*).

On December 15, 2016, Sgt. Lindenberg came to Plaintiff's cell and told Plaintiff to stop sending kites because "ain't nobody gonna do shit for you" (Doc. 1 at 41-42).   Later, during the morning shift, Major Carter, Lt. Mennerich, Sgt. Snell, and other staff members walked past Plaitniff's cell (*Id.* at 41).   Major Carter told Plaintiff not to send any more kites complaining about his cell conditions and hygiene needs because they "don't give a fuck" (*Id.*).   Lt. Mennerich indicated Plaintiff already knew that, and Sgt. Snell told Plaintiff he would freeze to death in that smelly cell because he was not going to get any sheets or blankets (*Id.*).   On the same day during the 3 to 11 shift, Lt. Engelage and Officer Slavens came to Plaintiff's gallery and Engelage told Plaintiff he was going to make sure Plaintiff remained housed in cell 4-43 with no hygiene items, sheets, or blankets (*Id.* at 42).   Engelage told Plaintiff he would make sure Plaintiff became "real sick" due to the excessive cold and unsanitary conditions in his cell, and that maintenance staff had been told not to address any of Plaintiff's requests (*Id.*).   Slavens stated that he and Officer Wooley had discussed Plaintiff's kites about the conditions of his cell and that he disliked Plaintiff due to Plaintiff complaining to the courts about Menard staff (*Id.*).

On December 16, 2016, Officers Wooley, Gardiner, and McCarthy from the internal affairs and intelligence units came to Plaintiff's cell (Doc. 1 at 42).   Gardiner looked up at Plaintiff's cell and told Plaintiff it was planned to have him housed in an unsanitary "nasty ass cell" so he could get sick and die (*Id.*).   Wooley yelled up to Plaintiff and told him not to send any

more kites because it would be a waste of time (*Id.* at 43).   Gardiner also told Plaintiff to stop sending kites, and told Plaintiff he would not be moved to a better cell (*Id.*).   Later, Lt. Hof and Officer Myers walked by Plaintiff's cell, and Myers also told Plaintiff not to bother to send any more kites (*Id.*).   Myers told Plaintiff they know about the conditions in his cell and that is why he was placed there (*Id.*).

On December 17, 2016, Officer Sanders, #10362[3], came to Plaintiff's cell and, before Plaintiff could complain about his cell conditions, Sanders told Plaintiff he knew about the unsanitary conditions and he was not going to provide Plaintiff with cleaning supplies, a plunger, a new mattress, or anything else because he knew Plaintiff had filed court complaints against Menard staff and had a staff assault in his disciplinary history (Doc. 1 at 44).

On December 20, 2016, Gardiner and McCarthy came to Plaintiff's cell and reiterated their knowledge of Plaintiff's cell conditions and indicated Plaintiff would not be moved and would not receive showers or hygiene supplies (Doc. 1 at 44).   Later, on December 22, 2016, Major Carter, Lt. Mennerich, and Sgt. Lindenberg came on Plaintiff's gallery and stopped at his cell (*Id.*). Carter remarked that Plaintiff did not like being in his cell, but told Plaintiff to stop sending sick call requests because he would not receive any medical treatment (*Id.* at 45).   Mennerich told Plaintiff that the medical staff does not care about his medical conditions caused by his unsanitary cell (*Id.*).   Lindenberg indicated that he told the cellhouse staff to not allow Plaintiff to complain to counselors, grievance officers, or the warden about his cell (*Id.*).   Also on this day, Wooley escorted an inmate in Plaintiff's cellhouse and, while in front of his cell, told Plaintiff no one cares about his complaints or threats of filing another complaint (*Id.*).   Officer Gee and McCarthy also

---

[3] Plaintiff identifies two different defendants as Officer Sanders. The first is identified as "Officer Sanders" and the second is identified as "Officer Sanders, #10362."

escorted another inmate through the cellhouse and, while in front of Plaintiff's cell, McCarthy yelled at Plaintiff that he does not care if Plaintiff keeps taking him to court, and he was glad his house was not like Plaintiff's cell (Doc. 1 at 46).   Gee told Plaintiff he loves his co-workers and they had been planning to house Plaintiff in an unsanitary cell for weeks (*Id.* at 45).   Gee indicated they told all Menard staff to make sure Plaintiff was placed in an unsanitary cell and that they received his kites detailing the conditions, but Plaintiff's efforts to be moved were in vain (*Id.*). Spiller and Phelps also walked through and Plaintiff yelled to Spiller that Plaintiff had been informed that he was one of the staff members that had him housed in the unsanitary cell (*Id.*). Phelps said "they" were all involved in Plaintiff's cell placement, and told Plaintiff they "don't give a fuck" about Plaintiff suing them (*Id.*).   Phelps said he was not going to help Plaintiff because he knew Plaintiff pushed an officer back in 2013 (*Id.*).   Plaintiff also testified that Phelps acknowledged Plaintiff's cell conditions and his health issues, but told Plaintiff he would not assist Plaintiff in getting treatment due to the lawsuit Plaintiff filed against Spiller and the "court complaint" Plaintiff had filed (Doc. 153-1 at 453).

On December 23, 2016, Sgt. Spiller, Officer Wooley, and Officer McCarthy came through Plaintiff's cellhouse (Doc. 1 at 46).   Spiller told Plaintiff that he knew the conditions of the cell and he was going to make sure Plaintiff was not moved out of his cell because he was getting revenge for Plaintiff filing court complaints against Menard staff (*Id.*).   Wooley yelled to Plaintiff that staff from her unit have told the medical staff not to provide Plaintiff any medical treatment (*Id.*).   McCarthy told Plaintiff that he had spoken to the medical technicians and told them not to provide Plaintiff with medical treatment or document his medical conditions, and that he had told the cellhouse inmate workers that they should not provide Plaintiff with mops, plungers, blankets, or other supplies (*Id.* at 47).   At his deposition, Plaintiff testified that McCarthy told him he was

not going to provide him with any necessities because he had filed a lawsuit against Spiller and

discussed issues at Menard during an evidentiary hearing in 2016 (Doc. 153-1 at 445).   During a

later shift that day, Sgt. Laminack walked down Plaintiff's gallery and told Plaintiff he needed to

stop sending kites to the lieutenants, majors, and health care unit staff because he had ensured that

Plaintiff would not receive medical treatment and would not be moved from his cell (Doc. 1 at 47).

Laminack also told Plaintiff he and Myers had agreed to falsify the cellhouse shower logs to show

Plaintiff either received or refused showers (*Id.*).

On December 24, 2016, Nicole Marshall, a medical technician, came to Plaintiff's cell and

told Plaintiff the medical staff had received his sick call slips detailing Plaintiff's health conditions

caused by his unsanitary cell (Doc. 1 at 47).   Marshall told Plaintiff she did not care about his

chapped lips, dry throat, and issues with vomiting, shaking, and itching (*Id.*).   Marshall again saw

Plaintiff on December 25, 2016, and reiterated he would not receive any medical treatment and

that based on her knowledge of Plaintiff's cell conditions and his medical complaints, he already

had Hepatitis C (*Id.* at 48).   Later that day, Laminack was again at Plaintiff's cell and told Plaintiff

he made sure he was placed in the unsanitary cell and that Plaintiff would stay in that cell because

he assaulted an IDOC officer (*Id.* at 47).   Plaintiff testified at his deposition that Laminack told

him he was not going to better the conditions of Plaintiff's cell because Plaintiff had filed a lawsuit

against Officer Spiller and went before a judge in September 2016 to complain about Menard staff

(Doc. 153-1 at 439).

On December 26, 2016, Officer Gee came to Plaintiff's gallery and told Plaintiff to stop

sending sick call request slips (Doc. 1 at 47).   Gee also told Plaintiff his mail was being monitored

so he should not send out any complaints regarding his conditions of confinement (*Id.* at 47-48).

Plaintiff also testified that Gee saw the conditions of his cell and told Plaintiff he would not receive

any showers, cleaning supplies, or medical treatment because he had filed a lawsuit against Officer Spiller (Doc. 153-1 at 426). Later that day, Officer Myers came to Plaintiff's cell and told Plaintiff he was going to get his toilet fixed, but he needed Plaintiff to flush it first (Doc. 1 at 49). Plaintiff flushed the toilet and water with urine and feces spilled on the floor (*Id.*). Myers then refused to have the toilet fixed, or provide Plaintiff with any cleaning supplies (*Id.*).

On January 3, 2017, Plaintiff saw Major Allen who told Plaintiff he was one of the staff members who placed Plaintiff in the unsanitary cell (Doc. 1 at 49). Allen told Plaintiff he placed Plaintiff in that cell because of the staff assault in Plaintiff's disciplinary history (*Id.*). At his deposition, Plaintiff testified Allen told him he had received Plaintiff's kites about his cell and refused to address Plaintiff's complaints because he knew Plaintiff had told a federal judge in September 2016 about mistreatment by Menard staff (Doc. 153-1 at 396). Plaintiff later walked past Lt. Jetton and Lt. Scott and Scott told Plaintiff to stop sending kites about his clogged sink and toilet, and indicated he made sure Plaintiff was not provided with cleaning supplies, hygiene items, or sheets (Doc. 1 at 49). Plaintiff testified Scott told the North Two cellhouse staff not to better Plaintiff's living conditions because he told the federal judge about being mistreated at Menard (Doc. 153-1 at 458).

On January 4, 2017, while Plaintiff was waiting to be cleared for his court writ transfer, Lt. Gutreuter told Plaintiff he knew Plaintiff did not like his placement in the north two cellhouse because he had reviewed all of his kites directed to the lieutenants and majors detailing the unsanitary conditions (Doc. 1 at 50). Gutreuter told Plaintiff he made sure Plaintiff was not provided with medical treatment, cleaning supplies, showers, or anything else (*Id.*). Plaintiff testified that Gutreuter told him he instructed officers not to provide Plaintiff with necessities because he filed a lawsuit against them and went to federal court (Doc. 153-1 at 428).

As a result of the conditions in his cell, Plaintiff's skin itched, and he suffered from bleeding scabs and pus-filled blisters and bumps (Doc. 1 at 50).   Plaintiff also had a dry mouth, throat, and lips (*Id.*).   Because Plaintiff had no light switch in his cell, he suffered from blurry vision, dizziness, and headaches (*Id.*).   Plaintiff also could not sleep, or focus, and was angry and depressed with violent fantasies of hurting himself (*Id.* at 51).

## Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact.   *Celotex*, 477 U.S. at 323.   Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).   In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Discussion

### Count One: Eighth Amendment excessive force claim against Eovaldi

Plaintiff asserts Eovaldi used excessive force against him on November 30, 2016 by

twisting and bending Plaintiff's hand and fingers.   Defendant Eovaldi seeks summary judgment on this claim arguing the force claimed by Plaintiff was *de minimis*.

The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits the "unnecessary and wanton infliction of pain" on prisoners.   *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)).   "In cases involving the claimed use of excessive force, 'the core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm'." *Outlaw*, 259 F.3d at 837 (quoting *Hudson*, 503 U.S. at 7).   "In conducting this inquiry, a court must examine a variety of factors, including 'the need for an application of force, the relationship between that need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner.'"   *Id.*   With regard to the last factor, a plaintiff need not demonstrate a significant injury to state a claim for excessive force; however, "a claim ordinarily cannot be predicated on a *de minimis* use of physical force." *DeWalt v. Carter*, 224 F.3d 607, 620 (7th Cir. 2000) (emphasis added) (citing *Hudson*, 503 U.S. at 5).

Here, the evidence indicates that Plaintiff's fingers and hands were bent and twisted; however, there is no evidence that Plaintiff suffered any injury due to Eovaldi's actions, or that the occurrence lasted longer than a brief period of time.   Despite finding Plaintiff did not sustain any significant physical injury due to Eovaldi's actions, the Court recognizes that infliction of pain that is "totally without penological justification" is *per se* malicious.   *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (citations omitted).   Eovaldi has failed to set forth any explanation for the force he allegedly took and, as such, the Court finds Eovaldi's twisting and bending of Plaintiff's hands and fingers was excessive force.   Defendant Eovaldi is not entitled to summary judgment as

to Count One.

***Count Two: Eighth Amendment conditions of confinement claim***

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement, including the provision of adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).   Courts evaluating claims of unconstitutional conditions of confinement must consider: (1) whether the defendant prison officials acted with the requisite state of mind (the subjective component) and (2) whether the alleged deprivations were sufficiently serious to rise to the level of a constitutional violation (the objective component). *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).   In other words, to establish his Eighth Amendment claim, Plaintiff must show that he was subjected to conditions that denied him "the minimal civilized measure of life's necessities" and that Defendants acted with a culpable state of mind in denying him the same.   *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006).

Further, the Seventh Circuit requires that a plaintiff "do more than demonstrate a triable issue of fact with respect to the conditions he faces; he must also show that he suffered some cognizable harm from the overall lack of a sanitary environment."   *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016).

In seeking summary judgment on Count Two, Defendants set forth two arguments: first, that Plaintiff failed to show he suffered a cognizable harm due to the conditions in his cell; and second, that they should not be held liable for any injury preventable by the use of proper hygiene products.   With regard to their argument concerning a cognizable harm, Defendants assert there are no records and no evidence that any medical treatment was requested or received for Plaintiff's complaints of vomiting, itching, scratching, skin redness, swelling, blisters, sores, and muscle issues.   Defendants argue medical records from Stateville (where he was transferred to from

Menard) evidence that Plaintiff went to the health care unit multiple times, but never complained of any issue resulting from his conditions of confinement at Menard.   Defendants assert Plaintiff first made a complaint about eye problems including redness, swelling, and itching more than five months after his transfer from Menard.

Despite the lack of medical records evidencing a cognizable physical harm, such evidentiary "proof" is not required for Plaintiff to survive summary judgment.   Plaintiff has submitted evidence, and the Court at this juncture is required to view the evidence in the light most favorable to Plaintiff, that he suffered from multiple health conditions, including blisters, sores, and vomiting, while housed in cell 4-43 at Menard.   The record also indicates Plaintiff sought medical treatment for his conditions, but was denied.   While the Court notes that the conditions do not appear particularly severe or emergent, in *Gray*, the Seventh Circuit found the plaintiff demonstrated a sufficient, cognizable harm by introducing evidence that the conditions in his cell had likely exacerbated his asthma and caused him to develop skin rashes.   *Gray*, 826 F.3d at 1004-06.   Also in *Gray*, the Seventh Circuit set forth the standard for assessing an Eighth Amendment claim, noting that courts look for physical injury "that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain," but noted that *Gray* was a prison-conditions case, not a case about inadequate medical treatment, and the plaintiff had set forth enough evidence to show "some physical injury."   *Id.* at 1006 (internal quotations and citations omitted).   The Court finds the evidence here similar to that in *Gray* and finds that Plaintiff has demonstrated he suffered "some physical injury" while housed at Menard during the relevant time.   While Defendants clearly disagree, this is a material fact that precludes summary judgment.

Next, the Court considers Defendants' argument that they should not be held liable for any injury that is preventable by the use of proper hygiene products.  In support of this argument, Defendants rely on the declaration of Justin Snell, in which he asserts inmates in segregation receive toilet paper, soap, toothbrush, toothpaste, and deodorant (Doc. 153-1 at 519).  Snell also asserts that when an inmate transfers to segregation he receives two sheets, a washcloth, a towel, and a blanket (Doc. 153-1 at 519).  Defendants further assert Plaintiff could have requested an indigent hygiene bag.  Accordingly, Defendants argue that to the extent any of Plaintiff's alleged injuries were caused by lack of hygiene products, he should not hold Defendants liable for those injuries.

Defendants' argument is inapposite and ignores much of the evidence in the record. Plaintiff has attested that he frequently requested hygiene items, but his requests were ignored and refused by Defendants.  Although Defendants may dispute this, it is certainly a material question of fact.  Further, Defendants do not set forth, and the Court declines to consider, what injuries may have been caused by lack of hygiene supplies and what injuries may have been caused by the conditions of Plaintiff's cell.

For these reasons, Defendants are not entitled to summary judgment as to Count Two.

***Count Three: First Amendment claim***

A prison official who takes action in retaliation for a prisoner's exercise of a constitutional right violates the Constitution.  *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).  The Seventh Circuit has articulated that for a plaintiff to prevail on a First Amendment retaliation claim, he must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the defendant's decision to take the

retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)) (other citations omitted).

At the summary judgment stage, the Seventh Circuit has held that the burden of proving causation is split between the parties. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). Initially, in order to establish a prima facie case, the plaintiff must produce evidence that his speech was at least a "motivating" factor in the defendant's decision to take retaliatory action. *Id.* Then, the burden shifts to the defendant to rebut the causal inference raised by the plaintiff's evidence and show that the harm would have occurred anyway, despite the protected activity. *Id.* If the defendant fails to counter the plaintiff's evidence, then the defendant's retaliatory actions are considered a "necessary condition" of the plaintiff's harm, and the plaintiff has established the "but-for" causation needed to succeed on his claim. *Id.*

Plaintiff claims Defendants placed him in an unsanitary cell and refused to provide him with hygiene items, medical treatment, showers, and other necessities because he filed grievances and lawsuits against officials at Menard. Defendants assert they are entitled to summary judgment on this claim, arguing Plaintiff did not suffer a deprivation likely to deter First Amendment activity and that Plaintiff's First Amendment activity was not a motivating factor in Defendants' actions.

First, the Court considers whether Plaintiff suffered a deprivation likely to deter First Amendment activity. Defendants argue part of the deprivation Plaintiff alleges he suffered was a prohibition on filing grievances and assert this is belied by the record because Plaintiff was able to file grievances while at Menard during the relevant time. Defendants misconstrue Plaintiff's claim. Plaintiff's complaint and the screening order in this case clearly contemplate and focus this claim on Plaintiff's placement in an unsanitary cell. Defendants do not address this point in

their motion for summary judgment.   It is clear that placement in a cell such as that attested to by Plaintiff is a deprivation likely to deter First Amendment activity.

Next, the Court considers Defendants' argument that there is no evidence that placement in his unsanitary cell was motivated by Plaintiff's First Amendment activity.   More specifically, Defendants Carter, Reva Engelage, Eovaldi, Gardiner, Gee, Gutreuter, and Hartman assert there is no indication in the complaint that they ever stated they were motivated due to Plaintiff's practice of filing grievances or lawsuits.   Defendants explain Plaintiff only alleged these Defendants admitted their retaliatory intent at his deposition.   Defendants further remark that Plaintiff only generally alleges all Defendants said they were retaliating against him without any details, which is insufficient for a reasonable jury to find in Plaintiff's favor.

Although the Court agrees that the evidence and details supporting a finding of retaliatory motive are sparse, the Court cannot award summary judgment in favor of Defendants.   Plaintiff has attested to the accuracy of his complaint, and Plaintiff did in fact either attest or testify at his deposition that all Defendants, including Carter, Engelage, Eovaldi, Gardiner, Gee, Gutreuter, and Hartman, referenced either Plaintiff's filing of grievances or court complaints as motivation for their refusal to move Plaintiff to another cell, provide hygiene or cleaning supplies, or provide medical treatment.   The Court must consider this evidence in the light most favorable to Plaintiff at this time.   Accordingly, Defendants are not entitled to summary judgment as to Count Three.

### Count Four: Eighth Amendment deliberate indifference claim against Marshall, R. Engelage, and Lang

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment.   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).   In order to prevail on such a claim, Plaintiff must show first

that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

With regard to the first showing, the following circumstances could constitute a serious medical need: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

A prisoner must also show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'." *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the

inference that the defendants intentionally or recklessly disregarded his needs." *Hayes,* 546 F.3d at 524 (quoting *Sherrod v. Lingle,* 223 F.3d 605, 611 (7th Cir. 2000)).

Defendants argue that Plaintiff's numerous subjective complaints do not rise to the level of a sufficiently serious medical condition as a matter of law.   Defendants assert there is no objective evidence to support Plaintiff's allegation that he suffered pain, and argue Plaintiff's medical records show no objective medical issues were witnessed by any medical professional or brought to any medical professional's attention.   Again, Defendants' argument that there is no objective evidence of Plaintiff's medical issues is misplaced.   At this juncture, the Court must view the evidence in the light most favorable to Plaintiff and Plaintiff has submitted evidence that he attempted to obtain medical treatment, but was denied.   Moreover, the Court finds that although any one of Plaintiff's purported medical conditions may not meet the standard for a serious medical need under the Eighth Amendment, a reasonable jury could find that the combination of conditions and the duration during which he suffered from them (more than 30 days) presented a serious medical need.   Although the Court recognizes Plaintiff's conditions ultimately resolved on their own within a few weeks, this does not discount the fact that at the time he was in his segregation cell at Menard he suffered from medical conditions that could be found to be a serious medical need.

Defendants Marshall, Engelage, and Lang also argue they were not deliberately indifferent to Plaintiff's medical conditions.   Defendants assert there are no documented complaints from Plaintiff about his conditions while Plaintiff was at Menard.   Defendants also reference Plaintiff's Health Status Transfer Summary that was completed on December 28, 2016, in which Nurse Crane (who is not a defendant), made no reference to any obvious medical injury or condition (*see* Doc. 153-1 at 589).   The Court cannot accept Defendants' argument because Plaintiff has

presented evidence that he complained to Defendants Marshall, Engelage, and Lang about his medical conditions, and they ignored his requests for medical treatment.   Again, although Plaintiff's complaints are not documented in his medical records, this is not fatal to Plaintiff's case and the Court must view the evidence in the light most favorable to Plaintiff at this stage in the proceedings.   Because there is some evidence Defendants Marshall, Engelage, and Lang were aware of Plaintiff's medical conditions and failed to take action to address his complaints, a reasonable jury could find they acted with deliberate indifference.   Defendants Marshall, Engelage, and Lang are not entitled to summary judgment as to Count Four.

### *Qualified Immunity*

Generally, government officials are protected from civil liability when performing discretionary functions under the doctrine of qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001).   Thus, in order to evaluate a claim of qualified immunity, the Court engages in a two-part inquiry.   The first question is whether the defendants' conduct violated a constitutional right.   *Volkman v. Ryker*, 736 F.3d 1084, 1090 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overruled in part by *Pearson v. Callahan*, 555 U.S. 223 (2009)).   The second question is whether that particular constitutional right was "clearly established" at the time of the alleged violation.   *Id.*   The two questions may be considered in either order.   *Volkman*, 736 F.3d at 1090 (citing *Pearson*, 555 U.S. at 236-42).

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."   *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739

(2002)).   The unlawfulness of a particular official's action must be apparent "in light of the pre-existing law."   *Id.*   A party may demonstrate that a right was clearly established by presenting a closely analogous case establishing the defendant's conduct was unconstitutional or by presenting evidence the defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court.   *See Hope*, 536 U.S. at 739-40.

Defendants make only a general qualified immunity argument, asserting that: (1) Defendants did not violate Plaintiff's rights; and (2) they are entitled to qualified immunity.   The Court disagrees.   It was clearly established at the time of the events in question that placing Plaintiff in a cell with the conditions testified to by Plaintiff, and doing so for the purpose of retaliation without providing medical treatment implicates an inmate's constitutional rights. Accordingly, Defendants are not entitled to qualified immunity.

## Conclusion

Based on the foregoing, Defendants' Motion for Summary Judgment (Doc. 152) is **DENIED**.

**IT IS SO ORDERED.**

**DATED: October 22, 2020**

*s/* *Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**